Good morning, Your Honors. My name is Ronald Wilson. I'm appearing on behalf of Mr. Alamad. We're here today, hopefully, to get a fair and impartial arbitration, which we feel we did not get before the Area Board of Adjustment. The District Court below, of course, dismissed our appeal for lack of jurisdiction. And I believe that was an erroneous ruling on several grounds. I think there was jurisdiction. And although we had a couple of technical procedural bases, I think there were at least three substantive reasons that the Court should have exercised jurisdiction and, in fact, should have vacated the arbitration award. The first one is fraud and corruption. You have a pretty heavy burden. I mean, this is an arbitration under our law. This is about as difficult a burden as there is in the law, in arbitration law, in any event, in trying to set aside an arbitration award. The narrowest known, or among the narrowest known to law, I think, is what the cases talk about. And I'm aware of that. And I think we, in fact, are one of the cases that fit through the eye of that needle, quite frankly. I've been practicing 30 years in this state. And, in fact, if you look at some of the comments of the arbitrator, I'll go through not just the comments, but some of the actual substantive rulings that he made. One particular comment that doesn't really appear in the District Court opinion was the comment about how he'll show, I mean, I won't use the invective, but basically he'll show you what happens when you mess with the guy, although he didn't use the word mess with the guy. Well, what does he say? Why don't you just tell us what he said, rather than characterizing or euphemizing? Yeah, the FCC. He says, I'll show you what happens when you fuck with the man who has the final written opinion. That's basically what he said. And I interpreted that to mean... What did he say basically? Well, I'll quote it. Is that what he said? Almost. Well, pretty close. I can, we have it here. I'll quote it. He may not have said fuck with the man. He may have said fuck with the person. But you're quoting from the record in another case, are you not? No, no. I'm quoting from J.R. Ruiz, who was the, one of the union panel member. Yes. He took his deposition after the arbitration was over. After the arbitration. But... And these are comments that he said he heard Chairman Angelo make. That's the source of the information. It comes from one of the panel members. But you were aware during the arbitration of many of the things which you complain about now, yet you did not move for accusal. Well, I wasn't aware of all of it, first off. I wasn't aware of these specific comments. I was aware that I felt he was not making fair rulings. I was aware, for instance, we wanted to introduce evidence about Susie Kimball, the HR person, and he didn't do that. Keep in mind, I was, I wasn't aware of the specific comments that I'm going to show these guys what happens when you fuck with the man who writes the written opinion. That came up afterwards. Who was aware of these comments? Ruiz? I don't know that during the arbitration anyone was aware. Keep in mind, some of these comments were made after the arbitration. We started the arbitration in January of 2002. I think the final hearing was in June sometime. And they finally convened in maybe August, September, to write the opinion. And some of these comments came out during the summer. And then ultimately we took Mr. Ruiz's opinion and got the final proof. But didn't you say something to the panel about bias or prejudice? And then they gave you a, they said we'll hear that later, but then you never avail yourself of that opportunity. I believe we got unfair evidentiary rulings. I did not move to refuse him during the arbitration. I didn't think during the arbitration we had a basis to show there was fraud or corruption or they were exceeding their jurisdiction, not during the arbitration. It's after we get the comments after the arbitration and after I see his written opinion that I realize what's really going on. Of course I objected to some of the evidentiary rulings, but it's an arbitration and there are lots of evidentiary rulings. I didn't think that was a basis to recuse someone that he rules against you on certain evidentiary rulings. But as an example, one of the things that wasn't even discussed was Article III of the Collective Bargaining Agreement. Article III specifically addresses the work hours. It specifically addresses the exclusion of the meal periods from the work hour. That wasn't even mentioned. And if you look at his award, the award says just the opposite. The award says that the tour of duty includes the lunch period, but there's no reference whatsoever to the Collective Bargaining Agreement. He just totally ignored that. But there was four and a half days of hearing and an extensive opinion that goes into great detail. It isn't as if they just brushed the case off. Well, he discusses a lot of things. I don't think he discusses merely relevant things. For instance, he doesn't discuss the public policy. He didn't even address that issue, whether he agreed with it or not. There's a California public policy, well-developed law. It talks about if you're away from your employer's premises, if you're not paid, if the employer's not getting any benefit, you're off the clock. There's no tie between you and the employer. That was not even discussed at all. He refused to even hear the argument. And Mr. Ruiz talks about that in his dissent. He wouldn't even hear that argument. He wouldn't let us even present it. Another key point to me... I guess I'm having difficulty understanding how this is now any more than your disagreement with various interpretations of law made by the arbitration panel. Well, it's not an interpretation. You think lunch hour was covered, wasn't covered. I mean, this is something that... Maybe they were wrong, but so what? I mean, they're entitled to be wrong. That is not a basis for setting aside an arbitration award. That's true. But the cases... So what have you got? That they have ignored the law. They did not even consider the arguments. The cases talk about if you don't... I'm not sure what you mean by not consider. You... Article 3. I'd say Article 3. If we take Article 3. Was it presented in arbitration? Of course it was presented in arbitration. And they shouldn't have listened. I don't know if they listened or not. I hope they heard it, but they didn't... They were there. Does that mean because they didn't adequately respond to your arguments, does that mean they didn't consider it? Well, they ignored it. They don't even comment on it. I mean, if we have a case that is basically about a man who was fired on his lunch, they said he was violating a rule. There's one specific rule in the collective bargaining agreement that directly deals with that. It's not even mentioned at all. Worse than that, if you look at the award, it says specifically that lunch is included. So either he totally ignored it or he twisted the facts. The law also talks about his jurisdiction only being to kind of interpret the agreement that the parties have. He can't twist and ignore explicit provisions. To me, it's almost like a red light, green light case. The law says you can't go through the red light, and he says he just ignores it. The light was green, and he says it's red anyway. It's just that, to me, we got a total denial of due process. He didn't even listen to the argument. He wouldn't consider it at all. It wasn't like he said, well, I understand what you... There were two arbitrators, right, to that rule against you? Well, we had the company representative, Fisher Herschel, American member, Mr. Ruiz, and then, of course, the chairman. So when you say he, you're referring to who? Well, I'm referring to the chairman. He had two votes against you? Yes. The chairman wrote the opinion, apparently, which is another issue. The two of them were discussing it, which I think was not proper. They were discussing and created a preliminary draft of the opinion before the union representative, Mr. Ruiz, even showed up. We found out that later, of course, that was afterwards, because that was in, I think, August, September, when they convened to do that. But the chairman is the one who actually wrote the opinion. He's the one who, I think, really exhibited the bias. I think Ms. Herschel, the other member, basically rubber-stamped the company's position. I mean, I don't have any evidence that she was... I think it was Mr. Ruiz was being independent. No, I think he was in favor of... You're relying on him for all sorts of things, but you don't dismiss her as being irrelevant. No, I'm relying on him because he's the man who came forth and disclosed these comments to us. But he also said from his dissent, you say he dissented on this kind of background. You give him... Well, I agree with his position because, for instance, he at least wanted to discuss Article 3. You don't think he was just doing the union's bidding? I think he wanted to put everything in front... No, I'm asking you. I mean, you said the representative of the employee, you said, was just sort of taking the employee aside. But the union's representative was not, was being impartial? It seems to me you need to treat them... I understand what the Court is saying. I would imagine the union official has a bent toward the union. I'd imagine the company has a bent toward the company. And that's why you need a neutral arbitrator in the middle. And I understand that. In the case of a bias or prejudice, that really doesn't divide into union or employer lines, is it? No, I don't think so. And I think his comments are indicative of that. I mean, I think when you have a panel member telling us up front, I'm going to pay you back, basically, is what he says, when you see that... To counsel, does it? Not to Mr. Alleman? The specific comments are to counsel. But when you say that the retaliation for the dislike of counsel is going to be reflected in your written opinion, when you ignore specific provisions of a collective bargaining agreement that you're charged with interpreting and enforcing, when you ignore California public policy, when you even hear the argument from your panel member, you won't even hear the argument or the discussion. And I've read some of the cases where arbitration awards were set aside, and I don't think they rise to that level. Very rarely are you going to have a guy come and admit that, look, I'm going to be biased and I'm going to rule against you, not based on the law or the evidence, but based on my dislike for you. I mean, you don't ever have a videotape of a guy saying that. I can't imagine something closer than saying, you know, I'm going to show you what happens when you fuck with an Italian. I'm going to show you what happens when you fuck with a man. Well, now, let me make sure I understand the time sequence here. All of the comments that you're telling us about now were not known, you say, during the process itself. Is that correct? I found out about those specific comments later, after the arbitration was over. How could there be a decision and award before the Area Board of Adjustment? That's dated September 3, 2002. I can't tell you about all of them. For instance, one was a comment about, these guys better knock it off, or they better stop doing this. I did hear a comment like that during the hearing. That's not going to get you very far. The bad stuff you heard after September 3. Well, after the close of evidence, for instance, we didn't hear anything about, I won't even consider the public policy until the actual consideration. You're very vague and confusing. I want to know when you heard all this bad stuff. Did you hear it before September 3, 2002 or not? You know, in the trial court, we'd say there's a gigantic silence now. Well, I'm trying to remember the exact dates. You're trying to rely on this stuff to show bias. I'm asking you when you found out about it, and you don't know. Well, I did not find out about it until after the hearing was closed. That's for sure. Well, is it because if you found out about it before, you would be deemed to have waived this because you didn't present it to the board? No, because he didn't tell us about that until afterwards. And I don't think he actually... Who didn't? Mr. Ruiz. In the deposition? I think before the deposition, we took the deposition. I think he told us before the deposition, but that was after... I have to tell you, I'm rather astounded. You cannot tell me when you heard this stuff. Well, I can't tell you the specific date. I can tell you it was after... Well, you wrote a letter dated December 2 to Chairman Angelo in that letter informing Angelo of the allegations. So not until December did you write the letter. That's correct. And that's three months after the decision. Yes, I think the decision was in September. And what was your purpose in writing the letter at that point, the decision having been rendered? Well, to see if he would voluntarily recuse himself. From what? What was still pending after the decision had been entered on September 3? Well, from the decision-making process, because at that point we had the actual sworn testimony of what had occurred when we took the deposition. I'm confused. We've got a decision dating September 3. Is that a final decision? I believe so. And what's left to do with this? Well, it never served on us. I mean, technically it wasn't final. Ignore that. What's left to do? That's a final decision. I believe it's final. There was a dissenting opinion that they did not... So that three months later you write a letter complaining about some stuff that was allegedly said that's reported under the deposition. And what were you trying to accomplish three months later with respect to a final decision that had been entered three months earlier? Well, I had never heard from Mr. Angelo and we were doing our discovery and we wanted to know what his position was. Mr. Ruiz had in fact made those comments. You had a final decision. Three months later you write a letter. Did you ask for a reopening, for a rehearing? I'd have to actually read my December 2nd letter. That may have been in the December 2nd letter. Well, what was in it? Well, let me look at it. It's 244 and... Well, you don't remember what was in the letter? Well, basically I asked him to recuse himself, but I haven't committed... For what? That's what I can't understand. For what? Well, the comments that he made... You had a final decision. What were you asking him to recuse himself from? It's over for three months. Well, I believe he could have admitted the comments he made.  the letter. He could have said he was biased and he could have withdrawn he could have taken some action. Withdrawn from what? It's over in September. That's why I keep asking you, is there anything that's left on this? He might have given us a statement to help us to have it vacated. You just wrote him a letter saying you made all these statements and then you were hoping that somehow he might do something favorable to you. I didn't know. I mean, quite frankly, I didn't know what he would do. I'd never been confronted with an arbitrator who would make such what he would do. Did you ask to reopen? I don't think we asked to reopen the hearing. Not in that letter. Oh, here it is right here. May I have a moment just to peruse the letter? You've got four minutes left. If you want to save any of the time for a buck, you have to keep that in mind. Clock is ticking. We're basically asking him to recuse himself. From what? To vacate the arbitration award. And then, of course, we recount the statements that he made. And we asked him for a response. That's what's said in the December 2nd letter. Thanks. Thank you. Morning, Your Honor. May it please the court. My name is Donald Haberman. I'm here on behalf of American Airlines. Here's a reason. Is there anything that you've heard this morning that was not adequately addressed in your brief? No, Your Honor. And I'm content to stand on the brief if the court would like to save time in argument. There be no questions. Thank you. The case is argued. We'll stand submitted. We'll next hear argument in San Lozano Association v. O'Connor. Thank you.
judges: Kozinski, Trott, Sand